**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| KIMBERLY LYNN PRINGLE, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-07-565 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Kimberly Lynn Pringle's ("Pringle") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Pringle appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, it is ordered that Pringle's Motion for Summary Judgment (Docket Entry No. 12) is denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) is granted, and the Commissioner's decision denying disability income benefits is affirmed.

**I.**    ***Background***

Pringle filed an application for disability insurance benefits with the Social Security Administration ("SSA") on April 28, 2005, alleging disability beginning on November 25, 2003,

as a result of degenerative disc disease,[1] lumbar[2] disk protrusion, chronic lumbosacral myofascial,[3] L4/L5 membrane instability, postural facet arthropy,[4] piriforomis syndrome,[5] and lumbar radiculopathy.[6]   (R. 39-44, 46).   After being denied benefits initially and on reconsideration, on November 17, 2005, Pringle requested an administrative hearing before an ALJ to review the decision.  (R. 30-33, 25-26).

A hearing was held on October 25, 2006, in Houston, Texas, at which time the ALJ heard testimony from Pringle, George W. Weilepp, M.D. ("Dr. Weilepp"), a medical expert who is a board certified orthopedist, and Emma Vasquez ("Vasquez"), a vocational expert ("VE").  (R. 11, 222-246).   In a decision dated November 14, 2006, the ALJ denied Pringle's application for benefits.  (R. 11-16).  On November 26, 2006, Pringle requested review of the ALJ's decision by the Appeals Council of the SSA's Office of Hearings and Appeals.  (R. 6-7).   The Appeals Council, on January 11, 2007, denied Pringle's request to review the ALJ's determination.  (R. 3-5).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel,*

---

[1]  "Degenerative disc disease" refers to a degeneration or deterioration of the disc.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 465 (29th ed. 2000).  "Discus" or "disc" is a general term in anatomical nomenclature to designate the circular flat plates which extend from the axis to the sacrum.  *See id.* at 510-511.

[2]  "Lumbar" pertains to the parts of the sides of the back between the thorax and the pelvis. *See* DORLAND'S, *supra,* at 1029.

[3]  "Myofascial" involves the facia, which is a band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs, surrounding and associated with muscle tissue.  *See* DORLAND'S, *supra,* at 652, 1170.

[4]  "Arthropathy" pertains to any joint disease.  *See* DORLAND'S, *supra,* at 152.

[5]  "Piriformis syndrome" is a condition in which the piriformis muscle irritates the sciatic nerve, causing pain in the buttocks and referring pain along the course of the sciatic nerve.   *See* DORLAND'S, *supra,* at 1392.

[6]  "Radiculopathy" is a disease of the nerve roots.   *See* DORLAND'S, *supra,* at 1511.  Therefore, "lumbar radiculopathy" is a disease of the nerve roots near the sides of the back between the thorax and the pelvis.

2

530 U.S. 103, 107 (2000).  Pringle filed this case on February 8, 2007, seeking judicial review of the Commissioner's denial of her claim of benefits.  *See* Docket Entry No. 1.

## II.   *Analysis*

### A.   *Statutory Bases for Benefits*

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).  The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence.  A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F.2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Pringle has acquired sufficient quarters of coverage to remain insured through March 31, 2009.  (R. 11). Consequently, to be eligible for disability benefits, Pringle must prove that she was disabled prior to that date.

Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act.  See 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a).  Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

**B.**     *Standard of Review*

      **1.**     *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

4

### 2.    *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve. *Id.*

### C.    *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.  *See* 20 C.F.R. § 404.1520(d).

4.   If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  *See* 20 C.F.R. § 404.1520(e).

5.   If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05.   The claimant has the burden to prove disability under the first four steps.  *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner at step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).   If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested.  *See Boyd*, 239 F.3d at 705.   A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).   An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.   *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).   A claimant is deemed disabled under the Act only if she demonstrates an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if the impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2009.

2.    The claimant has not engaged in substantial gainful activity since November 25, 2003, the alleged onset date (20 C.F.R. §§ 404.1520(b) and 404.1571, *et seq.*).

3.      The claimant has the following severe impairments: disorders of the back (discogenic and degenerative) (20 C.F.R. § 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work characterized by the ability to stand/walk 6 hours or more for up to 1 ½ hours at one time during an 8-hour workday and sitting for up to 6 hours cumulatively for up to 2 hours at one time during an 8-hour workday; but, compromised by the inability to frequently kneel, crawl, or squat; no heavy industrial vibration; and infrequent work at heights or climbing of ladders (occasional not precluded).

6.      The claimant is capable of performing past relevant work as bank teller (light/semi-skilled), electrical assembly (sedentary/semi-skilled), and sales associate (light/unskilled). This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(R. 13-15).  Because the ALJ found that Pringle could perform her past relevant work, in a conclusive finding that no disability exists, the ALJ's analysis was terminated and he did not continue on the fifth step of the inquiry.  The ALJ simply concluded with his last finding:

7.      The claimant has not been under a "disability," as defined in the Social Security Act, from November 25, 2003 through the date of this decision (20 C.F.R. § 404.1520(f)).

(R. 15).

This court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Pringle's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts;

(2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

### D. *Issues Presented*

Pringle claims that the ALJ erred by failing to apply Social Security Ruling 06-03p and, therefore, not giving any weight to the testimony of Pringle's acupuncturist. *See* Docket Entry No. 12, at p. 3. The Commissioner disagrees with Pringle's contention, maintaining that the ALJ did not have to give Pringle's acupuncturist as much weight as a licensed physician, and that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 14.

### E. *Review of the ALJ's Decision*

#### 1. *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42

U.S.C. § 423(d)(2)(B); *see Zebley*, 493 U.S. at 536 n.16; *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments matches or is equivalent to a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id.*  An impairment that manifests only some of the specified criteria, no matter how severe, does not qualify.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if

the medical findings are at least equal in severity and duration to the listed findings.  *See* 20

C.F.R. § 404.1526(a).  The applicable regulation further provides:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

20 C.F.R. § 404.1526(a).  Nonetheless, "[a] claimant cannot qualify for benefits under the

'equivalence' step by showing that the overall functional impact of his unlisted impairment or

combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531.

Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman*

*v. Shalala*, 1 F.3d 357, 364 (5.th Cir. 1993)

A review of the medical records submitted in connection with Pringle's administrative

hearing reveals that she was involved in an on-the-job accident on November 17, 2000, resulting

in injury to her lower back.  (R. 106, 120, 124, 128, 130).  The injury occurred after a 100 pound,

4x3 foot steel panel fell on Pringle's left hand, after which she repeatedly yanked with her left

arm and subsequently used her right arm to lift the panel off of her left hand.  (R. 106, 120, 124,

130).  Pringle alleges that her back pain began several hours after the accident.  (R. 128).

Scott D. Alcott, D.C. ("Alcott") maintained a log of the chiropractic adjustments he

performed on Pringle subsequent to her on-the-job accident.  (R. 139).  The log reveals that on

December 16, 2000, Pringle visited Alcott complaining of severe lower back pain.  (R. 139).  On

11

December 22, 2000, Alcott noted that Pringle's pain decreased temporarily after the adjustment. (R. 139).

Nathan L. Gross, M.D. ("Dr. Gross") examined Pringle on January 9, 2001. (R. 127-129). Dr. Gross noted that she appeared in his office with drawings all over her back with actual words next to the drawings that other people had written. (R. 127). During the examination, Dr. Gross observed that Pringle's walking pattern and gait were both normal. (R. 128). He finally noted that Pringle does have lower back pain that extends down into her legs, which was correlated by the MRI finding that she had a herniated disc[7] at L5-S1. (R. 129). Dr. Gross again noted that Pringle had a peculiar affect, as evidenced by the drawings and writings she had all over her back and legs. (R. 129). Dr. Gross opined that Pringle was not a good surgical candidate at that point, and that she could continue working, but refrain from twisting or bending at the waist and lifting more than 15 to 20 pounds. (R. 129).

On February 2, 2001, Alcott noted in his log that an MRI revealed Pringle had a herniated disc. (R. 139). On February 6, 2001, Pringle visited Alcott for an adjustment still complaining of lower back pain. (R. 139).

On February 7, 2001, Pringle had an appointment with Mike Paonessa, D.C. ("Paonessa"). (R. 100). Paonessa observed that Pringle walked with a limp, and that a male friend helped her into his office. (R. 100). An x-ray revealed decreased disc space at L5-S1 interspace, a rotational misalignment at L3 and the left sacroiliac[8] joint to be rotated internally. (R. 100). Paonessa

---

[7] "Herniated" means to protrude like a hernia, which is the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening. *See* DORLAND'S, *supra*, at 811, 814.

[8] "Sacroiliac" denotes the joint or articulation between the sacrum and illium and the ligaments associated therewith. *See* DORLAND'S, *supra*, at 1593.

diagnosed Pringle as having acute subluxation[9] of the lumbar vertebrae concomitant with sprain strain, and acute subluxation of the sacroiliac joint concomitant with lumbosacral radiculitis. (R. 100).  It was finally noted that Pringle's limitation and work restriction was severe, and that she was incapable of minimum (sedentary) activity.  (R. 101).

Pringle again visited Alcott on February 9, 2001, where she complained of muscle spasms at night.  (R. 139).

Syed A. Enam, M.D. ("Dr. Enam"), a neurosurgeon, examined Pringle on March 29, 2001, at the request of Alcott.  (R. 106-107).  Dr. Enam observed that Pringle had a weakness in the left lower extremity, but that she was able to walk on her heels and toes without any difficulty.  (R. 107).  Dr. Enam opined that Pringle was suffering from discogenic[10] pain at the L5/S1 level with possible radicular symptoms.  (R. 107).  After finding that her symptoms, as a whole, were unclear, Dr. Enam ordered a CT myelogram and EMG, and ordered Pringle off of work for the next eight weeks.  (R. 107).

The EMG was performed on May 18, 2001, by Jay Kaner, D.O., F.A.C.N. ("Dr. Kaner"). (R. 102-103).  The test suggested bilateral L5/S1 involvement with minimal denervation[11] at L5. (R. 103).  Dr. Kaner further noted that Pringle's reflexes were normal.  (R. 103).

Dr. Enam examined Pringle on June 12, 2001, during which he opined that the diagnosis was unclear.  (R. 104-105).  While Pringle did complain of constant lower back and leg pain, her symptoms were completely relieved when she sat down.  (R. 104).  Dr. Enam noted that Pringle's films and her physical exam findings and symptoms did not correlate, and that while she may

---

[9]  "Subluxation" is an incomplete or partial dislocation.  *See* DORLAND'S, *supra*, at 1719.

[10]  "Discogenic" pain is caused derangement of an intervertebral disk.  *See* DORLAND'S, *supra*, at 510.

[11]  "Denervation" is the resection or removal of the nerves to an organ or part.  *See* DORLAND'S, *supra*, at 472.

experience some discomfort due to her disc degeneration, she should exhaust all conservative measures of treatment.  (R. 104).

Pringle visited Dr. Gross on November 20, 2001, advising him that her back muscles feel stronger, but she continued to experience back pain.  (R. 124).  Pringle also indicated that she experienced a burning sensation toward her lower back at times, and also felt tingling in her legs. (R. 125).  Pringle also told Dr. Gross that she did some home exercises with a Thera-Band, tried to walk regularly in a mall, and had done some stationary bicycling.  (R. 125). During her examination, Dr. Gross noted that Pringle had normal lower extremity strength, did not exhibit true radicular symptoms, her hip motions were intact, and she had supple lumbar muscles. (R. 125).  After reading the previous EMG report, Dr. Gross opined that he did not agree that the report revealed enough abnormality to depict bilateral radiculopathy.  (R. 125).  Dr. Gross noted that Pringle did have chronic back pain that was likely to restrict her for the long-term, and that further treatments may not result in any significant changes; however, Dr. Gross opined that Pringle could still work with several restrictions, including avoiding twisting or bending at the waist, and not lifting more than 25 pounds repetitively.  (R. 126).

The medical record does not indicate that Pringle attended any doctor appointments during the entire year of 2002.  Her medical record indicates that she returned to see Alcott after a car accident, as evidenced by an Auto Accident Case Form that she filled out in Alcott's office on June 6, 2003.  (R. 140).  According to Pringle, she experienced pain in her neck, left shoulder, and lower back after the accident.  (R. 140).

Almost one year later, on April 23, 2004, Pringle visited Dr. Gross for the third time. (R. 119-123).  Pringle stated that she felt basically the same, and was experiencing lower back pain, burning in her back, increasing pain associated with standing for long periods, and tingling

in her right calf.  (R. 119).  Dr. Gross noted that Pringle had not had surgery at the time of her appointment, and was not currently on any medication.  (R. 120).  During the examination, Pringle told Dr. Gross that she had worked for Cardinal Health from April 15, 2002, until she was laid off on November 25, 2003.  (R. 120).  Pringle also stated that before being laid off, she felt she was able to do her work, which included repairing small endoscopes and other light medical equipment.  (R. 120).  Dr. Gross opined that Pringle could work with the same restrictions he had noted at her appointment several years earlier.  (R. 122).

On December 7, 2004, Pringle[12] was examined by Victor C. Gordon, D.O. ("Dr. Gordon").  (R. 130-135).  After the examination, Dr. Gordon suggested that Pringle avoid activities which required her to lift or carry more than 5 or 10 pounds.  (R. 135).  Dr. Gordon also noted that Pringle should avoid vigorous pulling, pushing, frequent bending and twisting movements, as well as protracted periods of sitting and standing.  (R. 135).

In a letter written by Alcott, dated June 14, 2005, he explained that Pringle stopped seeing him abruptly earlier that year because she moved approximately 46 miles away from his office. (R. 137).  Alcott opined that Pringle has serious injuries, that she was a candidate for surgery, and that her pain would increase with time and an arthritic response by her body would occur. (R. 137).

On July 6, 2005, an MRI was performed at the request of Joel Kershenbaum, M.D. ("Dr. Kershenbaum").  (R. 165-166).  The MRI report revealed disc bulging and facet and ligamentous

---

[12] At sometime between this appointment and the previous appointment, it appears that Pringle was married, as Dr. Gordon refers to her intermittently in his report as "Mrs. Pringle-Remer" and "Mrs. Remer."  (R. 130-135).

hypertrophy[13] at L4/5.  (R. 165).  It also showed disc space narrowing with desiccation[14] of the disc at the lumbosacral junction.  (R. 165).

Dr. Kershenbaum referred Pringle to the Neurosurgical Group of Texas, L.L.P on June 26, 2005, at which time she had an appointment with Warren D. Parker, M.D. ("Dr. Parker"). (R. 181-183).  During the examination, Pringle complained of experiencing lower back and leg pain for the past five years.  (R. 181).  Dr. Parker's examination revealed that Pringle was unable to get up on her left toes because of left calf muscle weakness.  (R. 181).

A CT scan performed on August 9, 2005, revealed a left L5/S1 herniated nucleus pulposus.  (R. 173).  A few days later, on August 15, 2005, Pringle visited Dr. Parker who recommended surgery.  (R. 180).  On August 30, 2005, a left L5/S1 partial hemilaminectomy[15] and decompressive foraminotomy[16] and disk excision[17] was performed at the Methodist Hospital by Dr. Parker.  (R. 169).  In a letter to Dr. Kershenbaum, Dr. Parker stated that the surgery was successful, and Pringle was entirely neurologically normal and ambulatory.  (R. 177).

On December 17, 2005, Pringle had her initial appointment at the American College of Acupuncture & Oriental Medicine.  (R. 200-210).  Pringle described her pain and physical limitations as very high.  (R. 207-209).  During the appointment, it was recommended that Pringle receive both acupuncture and an herbal treatment.  (R. 201).  Between December 21, 2005, and

---

[13]  "Hypertrophy" is the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells.  *See* DORLAND'S, *supra*, at 859.

[14]  "Desiccation" is the act of drying up.  *See* DORLAND'S, *supra*, at 483.

[15]  A "hemilaminectomy" is the surgical removal of one side of the vertebral lamina.  *See* DORLAND'S, *supra*, at 800.

[16]  A "foraminotomy" is the operation of removing the root of intervertebral foramina, and it is done for the relief of nerve root compression.  *See* DORLAND'S, *supra*, at 698.

[17]  An "excision" is the removal of a thing, such as an organ, by cutting.  *See* DORLAND'S, *supra*, at 631.

April 22, 2006, Pringle attended five acupuncture sessions at the American College of Acupuncture & Oriental Medicine. (R. 193, 196-199). At three of the sessions, it was noted that Pringle's pain had improved, and at the April 22, 2006, session it was specifically noted that the burning sensation was lessened, as well. (R. 193, 197, 198).

The last of the medical records indicate that Pringle continued acupuncture treatments with Jeffrey Remer[18] ("Remer") from May 15, 2006 through September 30, 2006. (R. 212-220). It appears that Pringle had nine sessions with Remer between those dates. (R. 212-220). During the acupuncture sessions, Remer noted Pringle's pain level as either improved, worsened, or had no change. (R. 212-220). At four of the sessions, Remer noted that Pringle's pain had improved; at three of the sessions it was noted that her pain had worsened; at two of the sessions it was noted that there was no change. (R. 212-220).

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from

---

[18]  As previously noted, it appears that Pringle married a man named Jeffrey Remer sometime during 2004. On several of her documents and medical records the name "Jeff Remer" is recorded as Pringle's "spouse." (R. 183, 205). Although it may be entirely coincidence, it appears that Pringle's acupuncturist's, Jeffrey Remer, is one and the same as Pringle's husband, Jeff Remer.

conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238

F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ

to discount the weight of a treating physician's opinion in favor of other experts when the treating

physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or

diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621;

*Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29

F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician

should be afforded considerable weight in determining disability, the ALJ has sole responsibility

for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d

at 621; *Newton*, 209 F.3d at 455.

In the case at bar, based on the objective medical facts and opinions of physicians, there is

substantial evidence in the record to support the ALJ's conclusion that Pringle is not disabled.

(R. 16).  Specifically, the ALJ adequately considered the opinions of non-medical sources.  Under

the regulations, evidence from acceptable medical sources is needed to determine whether Pringle

has a medically determinable impairment.  *See* 20 C.F.R. § 404.1513(a).  Acceptable medical

sources include licensed physicians, licensed or certified psychologists, licensed optometrists,

licensed podiatrists, and qualified speech-language pathologists.  *See id.*

In addition to the evidence from acceptable medical sources, an ALJ *may* also use

evidence from other sources, including nurse-practitioners, physicians' assistants, chiropractors,

therapists, school teachers, counselors, public and private social welfare agency personnel, and

other non-medical sources.  *See id.* at § 404.1513(d)(1).  Therefore, the ALJ was entitled to give

less weight to non-acceptable medical sources.  Because chiropractors and acupuncturists are

considered "other sources," it was within the ALJ's discretion to give such sources less weight.

18

Further, as the Commissioner points out, the Fifth Circuit has expressly noted that chiropractors are not medical doctors and the relevant regulations give less weight to chiropractors than to medical doctors. *See Porter v. Barnhart*, 200 Fed. Appx. 317, 319 (5th Cir. 2006); *Castillo v. Barnhart*, 151 Fed. Appx. 334, 335 (5th Cir. 2005); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *see also* 20 C.F.R. § 404.1513(d)(1). An acupuncturist, like a chiropractor, is *not* an acceptable medical source. *See id*. Thus, the opinion of an acupuncturist is not entitled to the weight that might be accorded a physician. *See Taylor v. Barnhart*, 125 Fed. Appx. 903, 904 (9th Cir. 2005); *Mitchell v. Secretary of Health & Human Servs.*, No. 93-1612, 1994 WL 96966, at * 6 (1st Cir. Mar. 25, 1994). For the above reasons, the amount of weight the ALJ gave to the acupuncturists' opinions was within the ALJ's discretion.

Pringle argues that the ALJ erred by failing to apply Social Security Ruling 06-03p ("SSR 06-03p"), which clarifies how the Commissioner considers opinions from sources who are not "acceptable medical sources" in disability cases. *See* Docket Entry No. 12, at p. 3. SSR 06-03p identifies factors "that apply to the consideration of all opinions from medical sources who are not 'acceptable medical sources' as well as from 'other sources.'" *See* SSR 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006). These factors include:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s), and

- Any other factors that tend to support or refute the opinion.

*See id.* at *4-5.

Here, the opinions of the chiropractors and acupuncturists are not regularly consistent with the opinions of the medical doctors who examined Pringle.  Both Drs. Enam and Gross noted that Pringle had a normal gait (R. 107, 128), yet Paonessa, a chiropractor, noted that Pringle walked with a severe limp.  (R. 100).  Also, Paonessa noted that Pringle had "severe limitations" (R. 101); whereas, Dr. Gross stated twice that Pringle's restrictions were less severe, and that she should simply avoid twisting and bending at the waist and carrying over 25 pounds.  (R. 126).  Further, Drs. Enam, Gross, and Kershenbaum actually read the reports of an MRI and EMG which are relevant diagnostic studies, in order to support their opinions.  (R. 104, 125, 129, 165).  In this regard, SSR 06-03p provides:

> The fact that a medical opinion is from an "acceptable medical source" is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an "acceptable medical source" because, as we previously indicated in the preamble to our regulations at 65 FR 34955, dated June 1, 2000, "acceptable medical sources" "are the most qualified health care professionals."

*See* SSR 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006).  The SSR as well as the case law supports the Commissioner's contention that, although non-medical source opinions may be considered by the ALJ, the opinions of such non-medical sources (*i.e.*, chiropractors and acupuncturists) are given less weight than the opinions of medical doctors.  *See Porter*, 200 Fed. Appx. at 319; *Castillo*, 151 Fed. Appx. at 335; *Taylor*, 125 Fed. Appx. at 903; *Mitchell*, 1994 WL 96966, at * 6; *Griego*, 940 F.2d at 945.

In sum, the record is missing the opinions of acceptable medical sources to support Alcott and Remer's assessments of Pringle's limitations.  (R. 100, 137, 139, 196, 199, 212-220).  Due to the absence in the record of objective factors and medical evidence to support Pringle's alleged symptoms and limitations, the ALJ had good cause to discount the weight of Pringle's non-

medical source (*i.e.*, chiropractors and acupuncturists) opinions in favor of the medical doctors' assessments.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211).

### 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding claimant's subjective complaints.  *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Sharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)).  When a claimant alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain.  *See Ripley v. Charter*, 67 F.3d 552, 556 (5th Cir. 1995) (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity.  *See id.*  It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128.  The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 & n.18.  Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability. *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Pringle testified regarding her complaints of pain.  (R. 225-233).  The ALJ's decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Pringle's pain:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> The claimant's reported activities are not shown to be consistent with her claim of total disability.
>
> If an impairment can reasonably be controlled by medication or treatment, it cannot serve as a basis for a finding of disability.  She had minor EMG changes in

22

2001 which were significant.  She underwent back surgery in August 2005 without any current post-operative complications.

The claimant is not seeking or receiving frequent medical treatment, which tends to undermine her allegations of incapacitating symptoms.

The claimant reports side effects from Vicodin use.  There is sufficient legal reason to reject complaints of side effects of medication when the claimant has not complained about these effects to her treating physician.

Even though the claimant alleges that she is only able to life the weight of one gallon of milk, the results of physical examinations in the record indicate that she should be able to lift up to 25 pounds.

(R. 15) (internal citations omitted).  Pringle testified that she was unable to do housework, cook, do yard work, go grocery shopping, and dress or play with her child.  (R. 227-228).  She told Dr. Gross, however, that she did some home exercises with a Thera-Band, tried to walk regularly in a mall, and had done some stationary bicycling.  (R. 125).  Such inconsistent testimony by Pringle supports the ALJ's finding that Pringle's testimony of pain, other subjective complaints, and functional limitations was not credible.  (R. 15).

The Court does not doubt that Pringle suffers from pain; however, the records do not support a finding that Pringle's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment.  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  As such, the ALJ's conclusion that Pringle's alleged limitations and symptoms were not credible is supported by substantial evidence.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

only if his physical or mental impairment or impairments are of such severity that his is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for his, or whether he would be hired if he applied for work.

23

42 U.S.C. § 423(d)(2)(A). The Commissioner bears the burden of proving that a claimant's functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id*. In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id*. In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . .   RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands:  sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands

and requires that the individual's capacity to do them on a regular continuing basis be stated. *See id*.  To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In this case, the ALJ, relying on the record evidence and Dr. Weilepp's (medical expert) testimony, determined that Pringle retained the residual functional capacity to perform light work characterized by the ability to stand/walk 6 hours or more for up to 1 ½ hours at one time during an 8-hour workday and sitting for up to 6 hours cumulatively for up to 2 hours at one time during an 8-hour workday.  (R. 14, 239).   The ALJ further found that Pringle's functional capacity was compromised by the inability to frequently kneel, crawl, or squat; no heavy industrial vibration; and infrequent work at heights or climbing of ladders.  (R. 14).  Recognizing that Pringle's ability to perform all or substantially all of the requirements of light work was impeded by additional exertional and/or non-exertional limitations, the ALJ elicited testimony from a VE to determine whether or not Pringle could perform her past relevant work given her residual functional capacity and other vocational factors.  (R. 15, 243-245).

The VE testified that Pringle would be able to perform her past relevant work as a bank teller, which was at a light exertion level and semi-skilled; as an electrical assembler, which is at a sedentary exertion level and semi-skilled; and as a sales associate, which is at a light exertion level and unskilled.  (R. 15, 243). The VE stated that these jobs fell within Pringle's residual functional capacity, incorporating the limitations Dr. Weilepp indicated.  (R. 243).  In his decision, the ALJ found the VE's testimony to be consistent with the information contained in the Dictionary of Occupational Titles.  (R. 15).  Taking into consideration the entire record

and testimony, substantial evidence supported the ALJ's RFC, his determination that Pringle could perform her past relevant work, and his finding that Pringle was not disabled.  (R. 15).

**III.**   *<u>Conclusion</u>*

Accordingly, it is therefore

**ORDERED** that Pringle's Motion for Summary Judgment (Docket Entry No. 12) is **DENIED**.  It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No 14) is **GRANTED**.  It is finally

**ORDERED** that the Commissioner's decision denying Pringle disability benefits is **AFFIRMED**.

**SIGNED** at Houston, Texas on this 31st day of March, 2008.

Calvin Botley
United States Magistrate Judge

27